UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARY MCBEATH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:22-cv-01216-TWP-KMB |
| CITY OF INDIANAPOLIS, | ) ) ) |
| Defendant. | ) ) |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Motion for Summary Judgment filed by Defendant, the City of Indianapolis ("the City") (Filing No. 58). Following Plaintiff Mary McBeath's ("McBeath") termination from the City's Parks and Recreation Department ("Indy Parks"), she initiated this action alleging violation of the Family and Medical Leave Act ("FMLA") and Title VII of the Civil Rights Act of 1964 ("Title VII"). McBeath alleges the City interfered with her rights under FMLA, retaliated against her under FMLA, and discriminated against her on the basis of race. For the following reasons, summary judgment is **granted**.

## I.   BACKGROUND

The facts stated below are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, they are presented in the light most favorable to McBeath as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

McBeath, an African American woman, was hired in January 2006 at Indy Parks as a Facility Attendant for Windsor Village Park ("Windsor Village") (Filing No. 68-2 at 1). During her time at Indy Parks, McBeath held several roles. (Filing No. 68-1 at 1-5). In 2011 she was moved into the Assistant Park Manager Position. *Id*. at 5. As Assistant Park Manager, McBeath

was responsible for the "overall management of programs, services, facilities, and personnel at [Windsor Village]" including but not limited to overseeing operations for the community food pantry program (Filing No. 60-12 at 1).While serving as Park Manager, McBeath played a key role in planning and fundraising for the construction of the Windsor Village Park Family Center. (Filing No. 68-1 at ¶ 6).  In 2013, she started the food pantry at Windsor Village with just two boxes of food, and helped the pantry grow such that she regularly picked up large donations from stores such as Gleaners, Meijer, Target, and Aldi. *Id*. at ¶ 9. Beginning in 2014, McBeath needed help loading and unloading the boxes of donations, so her husband regularly rode with and assisted her with the boxes. *Id*. at ¶¶ 11,12. After picking up donations from various stores, McBeath and her husband would stop at her house to drop off items that she later distributed to elderly, disabled, or housebound individuals in the community, or donated to other locations in the community before taking donations to Windsor Village. *Id*. at ¶ 15. She did this because there wasn't enough space to store all the items at the pantry. *Id*. at ¶ 16. The first time she was told her husband could not ride in the vehicle with her was March 2019.  *Id*. at ¶¶ 25, 26.

A.        **Indy Parks' Company Policies**

At the time Indy Parks terminated McBeath's employment, she was an Assistant Park Manager at Windsor Village (Filing No. 68-18 at 1).  McBeath was expected to follow Indy Parks' employment policies which are outlined in the Indianapolis and Marion County Employee Manual ("Employee Manual") (*see* Filing No. 60-2).  McBeath acknowledged that she received a copy of the Employee Manual and that it was her responsibility to read the manual, ask questions of her supervisor, and abide by and observe all of the information, policies, and procedures explained in the manual (Filing No. 60-5).  McBeath also acknowledged that the City may periodically change policies and she would be responsible for abiding by such changed policies.  *Id.*

Within the Employee Manual are Principles of Employment. The Principles of Employment require that employees demonstrate integrity, specifically stating that "[t]heft, making a false report or statement with intent to defraud… are examples of unacceptable conduct." (Filing No. 60-2 at 7.)  The Employee Manual also includes a Code of Ethics which establishes ethical standards of conduct for employees so that the public's confidence in the City-County government is maintained, and it applies to any persons who have a business relationship with City-County government. *Id*. at 9.  The Code of Ethics prohibits employees from using their public office for private gain and from using "City or County property or personnel for any purpose other than for official City or County business." *Id.* at 9, 10.  McBeath acknowledged that she received a copy of the Code of Ethics and that she was responsible for reading and abiding by the policies contained within (Filing No. 60-7).

Indy Parks also maintained policies regarding city-owned vehicles and food pantry distributions (Filing No. 60-3 at 70:7-17, 67:8-17).  The city-owned vehicle policy prohibited employees from taking city-owned vehicles home to their personal residences without prior approval.  *Id.* at 70:24-25, 71:1-2.  The policy also prohibited employees from transporting non-employees in city-owned vehicles without permission.  *Id.* at 71:3-6.  There was a verbal policy with Indy Parks and pantry employees regarding when they were eligible to take food or pantry donations.  *Id*. at 67:3-25. The verbal food pantry distribution policy prohibited employees from taking donated items directly from a vendor for their personal use.  *Id.* at 68:5-10.  All donated items from a community partner vendor were to go directly to the food pantry distribution site.  *Id.* Employees could then receive pantry donations from the food pantry distribution site after community members had been served during normal operational hours.  *Id.* at 67:20-25, 68:1-4.

3

The purpose of the food pantry distribution policy was to uphold the trust of the community and to be responsible stewards of the donated goods provided to the City. *Id.* at 69:18-25.

**B.     McBeath's Performance**

McBeath was generally a good employee, until the events that led to her termination. There were a few challenges that required corrective action, verbal warnings, and discipline. (*See* Filing No. 68-8 at 30:2-6; 30:7-14; 32:6-20; 39:14-23.) Prior to 2019, McBeath received a verbal warning based on a violation of Indy Parks' attendance policy (Filing No. 60-3 at 77:11-25, 78:1-13). She was flexing her time without prior approval and without discussing the change in schedule with her immediate supervisor, Shawn Cowherd ("Cowherd"). *Id.* Around the same time, McBeath and Cowherd failed to work together to schedule off days in a way that would not severely impact operations. *Id.* McBeath did not receive a verbal warning for this issue, but she had a conversation with Deputy Director of Operations and Programs, Kimberly Campbell ("Campbell"). *Id.*

Around September 2021, there were some performance issues with how the pantry was being operated under McBeath's supervision. (Filing No. 60-3 at 23:7-9). Indy Parks management received complaints from community members that they were seeing staff and volunteers leave the pantry with supplies or boxes before community members had an opportunity to select items from the pantry. *Id.* at 23:11-23. There were also complaints that McBeath was rude to community members during pantry operations. *Id.* at 23:24-25, 24:1. McBeath received a verbal warning for failing to properly implement Indy Parks' food distribution policy of ensuring that community members were the first to have access to donated pantry items. *Id.* at 24:4-22.

On January 24, 2022, Indy Parks received a complaint from a citizen who accused McBeath of stealing food pantry donations that were intended for the pantry program at Windsor Village (Filing No. 60-9 Filing No. 60-11). The citizen provided a video showing McBeath driving a city-owned vehicle to her home and unloading donated pantry items at her residence. *Id*. Indy Parks'

4

management informed Indy Parks Department of Human Resources ("HR") about the complaint received from the citizen (Filing No. 60-11). HR informed Indy Parks management that they would take over the investigation of the allegations against McBeath (Filing No. 60-3 at 40:1-25, 41:1-8). HR decided to engage the Indianapolis Metropolitan Police Department ("IMPD") to investigate the allegations against McBeath because her actions could constitute theft. *Id.* at 41:9-14.

On February 10, 2022, IMPD Detective Arleatha Marble ("Detective Marble") filed an affidavit and request for a search warrant to place a GPS monitoring device on the city-owned vehicle being used by McBeath (Filing No. 60-9). Detective Marble attested that she saw videos and photographs showing McBeath unloading items from the back and/or side of the city-owned vehicle. *Id.* at 4. Detective Marble also saw McBeath's husband exiting the city-owned vehicle carrying a large bag which he took inside the residence. *Id.* Based on Detective Marble's sworn statements, the videos and photographs were timestamped on September 30, 2021, January 11, 2022, and January 24, 2022. *Id.* On February 10, 2022, a Marion Superior Court Judge granted Detective Marble's search warrant request, permitting her to attach a GPS monitoring device to the city-owned vehicle that McBeath would be using (Filing No. 60-10).

On or around February 20, 2022, HR contacted Indy Parks management and informed them that IMPD's investigation confirmed the allegations against McBeath regarding taking donated items to her residence using the city-owned vehicle (Filing No. 60-3 at 73:15-25, 74:1-17). HR recommended that Indy Parks management terminate McBeath's employment. *Id.* at 44:3-25, 45:1. HR also informed Indy Parks management that IMPD's investigation could lead to prosecution. *Id.* at 43:12-19. Indy Parks management informed HR that they wanted to avoid prosecution. *Id.* at 43:21-25.

### C.     McBeath's Leave under FMLA

In 2021, McBeath began experiencing persistent pain and swelling in her knee (Filing No. 68-1 ¶ 34). Around December 2021, she informed Cowherd that she would be taking FMLA leave to have knee replacement surgery. *Id.* ¶ 35. On February 17, 2022, McBeath submitted a request for benefit leave beginning February 18, 2022 (Filing No. 60-4). Indy Parks approved McBeath's request for leave from February 22, 2022, through May 19, 2022 (Filing No. 60-8 at 2).

In March 2022, McBeath's manager asked her to attend a virtual meeting on March 4, 2022, with Campbell and HR Consultant, Adrianna Burgos (Filing No. 68-1 ¶ 37). During the meeting, McBeath was informed that she was prohibited from taking donations to her home and that action would be considered theft. *Id.* ¶ 39. McBeath was also informed that Indy Parks had a video showing her taking donations from her car into her home. *Id.* ¶ 40. Indy Parks informed McBeath that she had violated several Standards of Conduct, including theft and unauthorized use of company-owned property, excessive use of company-owned property, and engaging in conduct that would tend to discredit Indy Parks (Filing No. 60-11). McBeath admitted it was possible they had videos of her because she and her husband were having harassment issues with a neighbor taking photos and videos of them. (Filing No. 68-1 ¶ 41). McBeath was found to have violated the following Standards of Conduct:

- Theft, or unauthorized use of City-County property and resources (including but not limited to cell phones, the internet, and copiers), or misappropriation of funds;
- Excessive use of City-County property, including, but not limited to, telephone, landline and cell/mobile) and e-mail for personal reasons; and
- Engaging in unbecoming conduct or committing any act while on or off duty that would tend to discredit the City-County.

(Filing No. 60-11 at 1). At the end of the meeting, McBeath's employment was terminated (Filing No. 68-1 at ¶ 42).

6

## II.     LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, at 584.  "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).  Additionally, the Court is not "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).  Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor

district courts are obliged in our adversary system to scour the record looking for factual disputes. *Id.* (citation and quotation marks omitted); *see Reed v. Brex, Inc.*, 8 F.4th 569, 578 (7th Cir. 2021).

### III.   DISCUSSION

McBeath asserts three claims against the City in her Amended Complaint (*see* Filing No. 28).  Count I: interference in violation of FMLA; Count II: retaliation in violation of FMLA; and Count III termination of employment due to her race in violation of Title VII.  The City seeks summary judgment on McBeath's FMLA and Title VII claims, arguing that McBeath cannot establish a *prima facie* case under any claim.  The City also argues some of McBeath's supporting evidence should be disregarded as inadmissible when ruling on the summary judgment motion.

The Court will address the evidentiary issue before turning to the substantive claims.[1]

### A.   Evidentiary Issue

The City objects to McBeath's assertion that "Cowherd gave her permission to transport her husband in a [company] vehicle" (Filing No. 69 at 3). In McBeath's affidavit, she describes a conversation she had with Cowherd where he informed her that "he didn't have any problem with [her] husband riding in the [company] vehicle to help [her]." (Filing No. 68-1 ¶ 28). Cowherd's statement is used to demonstrate that McBeath had permission to drive a non-employee in the company-owned vehicle and therefore did not violate any verbal policy Indy Parks had.

The City argues this evidence is inadmissible hearsay and cannot be considered on summary judgment.  *See* Fed. R. Civ. P. 56(C)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Hearsay is an out-of-court statement, admitted for the truth of the matter asserted.  *United States*

---

[1] "Admissibility is [a] threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

*v. Breland*, 356 F.3d 787, 792 (7th Cir. 2004). Cowherd's statement to McBeath is inadmissible hearsay and cannot be considered.

B.      **Interference Claim under the FMLA**

The FMLA requires employers to allow employees to take up to twelve weeks of unpaid leave for serious health conditions during any twelve-month period. *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 498 (7th Cir. 2014). It is unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [FMLA]." 29 U.S.C. § 2615(a)(1). To prevail on an FMLA interference claim, an employee must establish that "(1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled." *Taylor-Novotny*, 772 F.3d at 498.

The parties agree that McBeath has established the first four elements of the FMLA interference test (*see* [Filing No. 59 at 10](); [Filing No. 67 at 16-17]()); they dispute whether the City denied McBeath a benefit to which she was entitled. The City argues they are entitled to summary judgment on McBeath's FMLA interference claim because the undisputed facts show that McBeath's FMLA request was approved and therefore she was not denied any benefit.

McBeath replies that her termination while on leave is sufficient to constitute a denial of FMLA benefits. McBeath cites *Kauffman v. Federal Exp. Corp.* for support. *See* 426 F.3d 880 (7th Cir. 2005). In *Kauffman*, an employer denied an employee's request for FMLA benefit leave and then terminated him for missing three days of work after suffering from bronchitis. *Id.* at 881. The court's discussion in Kaufman is centered on whether the employee adequately certified a serious health condition qualifying for leave and whether the employee turned in their paperwork

9

on time. *Id.* at 885. The Seventh Circuit held that the employee submitted his paperwork on time, and it was sufficient to certify a serious health condition qualifying for FMLA leave, and, thus, summary judgment was inappropriate. *Id.* at 887. That holding is not a blanket statement that termination is an automatic denial of FMLA benefits.

"An employee's right to return to work after taking leave is not unlimited; he is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 636 (7th Cir. 2009) (quoting 29 U.S.C. § 2614(a)(3)(B)). *See also* 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."). An employer may present evidence showing that the employee would not have been entitled to her position even if she had not taken leave; then it is the employee's burden to overcome the employer's assertion. *Cracco*, 559 F.3d at 636.

In *Cracco*, while an employee was taking medical leave under FMLA, the employer discovered several problems with the employee's work such as disorganized terminals, damaged equipment, and mishandling of overtime. *Id.* at 628-29. The employer terminated the employee upon the employee's return. *Id.* at 629. The court found that the employer "set forth substantial evidence that [the employee] was not entitled to resume his employment upon his return from leave because the company had, after an investigation, determined that he had not performed his duties in a competent manner." Because the employee did not present evidence showing that he would have retained his job had he not taken FMLA leave his interference claim failed. *Id.* at 636.

Here, the City has set forth substantial evidence demonstrating that McBeath was not entitled to resume employment upon return from FMLA leave. Indy Parks began an investigation

10

after receiving a complaint from a citizen that McBeath was stealing food pantry donations for personal use. Indy Parks was provided photographs and videos showing McBeath removing items from the city's van and carrying them into her residence (Filing No. 60-9 at 4). Indy Parks then contacted HR, and HR involved IMPD. IMPD's investigation confirmed that McBeath was taking items from pantry pick-up locations to her home, while using the city-owned vehicle, before dropping off the remaining items to the pantry. These actions were against company policy. HR recommended that McBeath's employment be terminated, and Indy Parks followed HR's recommendation.

In response, McBeath argues there are questions of fact regarding whether Indy Parks had policies related to the use of city-owned vehicles and food pantry distributions and whether McBeath violated such policies (*see* Filing No. 67 at 17-18). Whether Indy Parks maintained such policies does not create a genuine issue of material fact because McBeath was also terminated for violating the principles of employment listed in the Employee Manual (Filing No. 60-11). McBeath signed the Employee Manual agreeing to "abide by and observe any and all of the information, policies, and procedures explained [inside]." (Filing No. 60-5; Filing No. 60-6). McBeath does not dispute that before dropping off donations at the pantry, she used the city-owned vehicle to take items to her home and was recorded by a civilian doing so. So, even if no policy regarding the use of city-owned vehicles and food pantry distributions existed, the designated evidence shows McBeath was terminated for committing theft, an act that discredited Indy Parks, in violation of the Employee Manual. (*See* Filing No. 60-2 at 40) (The Employee Manual which lists "[e]ngaging in unbecoming conduct or committing any act while on or off duty that would tend to discredit the City-County" as conduct that may result in corrective action, including discharge).

McBeath acknowledged that she received a copy of the Employee Manual which contained the Code of Ethics and Standards of Conduct, and that she was responsible for reading and abiding by the policies. She has presented no evidence that would lead a reasonable trier of fact to conclude that she did not violate Indy Parks' company policies or that she would have retained her job had she not taken FMLA leave. For this reason, summary judgment is **granted** in favor of the City' on McBeath's FMLA interference claim.

### C.  Retaliation Claim under the FMLA

"The difference between a retaliation and interference theory is that the first requires proof of discriminatory or retaliatory intent while an interference theory requires only proof that the employer denied the employee his or her entitlements under the Act." *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 995 (7th Cir. 2010). A court evaluates a claim of FMLA retaliation in the same way it would evaluate a claim of retaliation under other employment statutes. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). An employee may proceed under the direct or indirect method of proof. *Id.* Under the direct method, McBeath must show: (1) she engaged in statutorily protected activity; (2) Indy Parks took adverse employment action against her; and (3) the protected activity caused the adverse action. *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 900-01 (7th Cir. 2018).

McBeath has established, and the City does not dispute, that she engaged in a statutorily protected activity when she requested FMLA leave, and Indy Parks took an adverse action against her when her employment was terminated. However, the parties dispute whether McBeath's utilization of FMLA played any role in Indy Parks' decision to terminate her employment.

When deciding on the question of causation, courts consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation. *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017). The "casual-nexus element may be met through either a direct

admission from [Indy Parks] or through 'a convincing mosaic of circumstantial evidence' permitting that same inference." *Pagel v. TIN Inc.*, 695 F.3d 622, 631 (7th Cir. 2012). "The convincing mosaic of circumstantial evidence may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Id.*

McBeath argues there is suspicious timing because she requested FMLA on February 17, 2022, began taking FMLA on February 22, 2022, and was terminated less than two weeks later. Although there is no set legal rule for determining when timing is suspicious, "the closer two events are, the more likely that the [protected activity] caused the [adverse employment action]." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012); *see McClendon v. Ind. Sugars Inc.,* 108 F.3d 789, 796–97 (7th Cir. 1997) (holding that a two- to three-day time period between the employee's complaint and his discharge was sufficient). Here, the investigation, which led to McBeath being terminated, began before she participated in the protected activity of requesting FMLA leave. On January 24, 2022, a citizen complained to Indy Parks' leadership that McBeath was taking donations from vendors for her personal use. On January 27, 2022, Indy Parks began investigating the citizen's claims. McBeath then requested leave about twenty days later. On February 20, 2022, HR and IMPD concluded their investigations and HR recommended to Indy Parks that McBeath's employment be terminated. Because Indy Parks, HR, and IMPD's investigations predate the protected activity, this timeline alone works against allowing an inference of causation based on suspicious timing.

McBeath also argues that Indy Parks' provided reason for terminating her is pretext. Pretext means "a dishonest explanation, a lie rather than an oddity or an error." *Faas v. Sears, Roebuck &*

*Co.*, 532 F.3d 633, 642 (7th Cir. 2008). To show pretext a plaintiff must "point to evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the termination." *Tibbs v. Admin Off. of the Ill. Cts.*, 860 F.3d 502, 506 (7th Cir. 2017) (internal quotation marks omitted).

McBeath first argues Indy Parks' reason for terminating her is baseless because she did not commit theft. She argues that she did not take donated food to her home for personal use but instead donated the food to other entities in the community, and she had openly engaged in such conduct for several years (*see* Filing No. 68-1 ¶¶ 15, 43). Indy Parks' verbal policy was that employees must take donated items directly from the vendor to the designated pantry distribution site (*see* Filing No. 60-3 at 68:5-14). Viewing the facts in the light most favorable to McBeath, even if she had for several years been donating the food to other entities in the community as opposed to keeping them for her personal use, she did not have Indy Parks' permission to do so, therefore, her employer reasonably found her actions constituted theft.

McBeath also argues that Indy Parks' reason for terminating her was not the actual motivation for her discharge because if so, Amy King ("King") would have been terminated as well. King is a white woman who began working for Indy Parks on July 6, 2022. During her time at Indy Parks, King had several incidents where she violated policies outlined in the Employee Manual. McBeath argues that King's actions violated Indy Parks' Standards of Conduct and yet she was never given any corrective action for her conduct (*see* Filing No. 67 at 14-15). This assertion is contradicted by McBeath's own evidence. On four separate instances, Indy Parks provided Notices of Unacceptable Performance or Conduct to King (*see* Filing No. 68-7; Filing No. 68-9; Filing No. 68-10; Filing No. 68-11). In addition to the written notices, King received a verbal warning (Filing No. 68-7 at 2). After King's incidents in June 2023, she was given a final

14

written warning (Filing No. 68-9 at 2). Campbell testified that Indy Parks intended to terminate King's employment, but King resigned before they had the opportunity to do so (*see* Filing No. 60-3 at 79:9-25). This assertion is supported by McBeath's evidence as well. Two notices provided by McBeath list "Termination" as the action to be taken (*see* Filing No. 68-10; Filing No. 68-11). From the evidence presented by both the City and McBeath, a reasonable juror can find that Indy Parks' proffered reason for terminating McBeath was honest.

Lastly, McBeath argues the reasons provided by Indy Parks for her termination are insufficient because there were no policies prohibiting her from taking food to other entities before taking it to the pantry, nor any policy that prohibited employees from allowing non-employees to ride in the city-owned vehicle. The City presented evidence that Indy Parks maintained a verbal policy that prohibited employees from transporting non-employees in city-owned vehicles (*see* Filing No. 60-3 at 70:7-25; 71:1-6). The City also presented evidence that Campbell told McBeath that only Indy Parks employees could ride in the city-owned vehicle. *Id.* at 58:11-25.

McBeath has submitted no evidence demonstrating that Indy Parks' proffered legitimate, non-discriminatory reason for terminating her employment, namely, violation of company policies, was pretext for retaliation under FMLA. Summary judgment is **granted** in favor of the City on McBeath's FMLA retaliation claim.

**D.     Race Discrimination Claim under Title VII**

Title VII of the Civil Rights Act of 1964 provides that, "[i]t shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, … or national origin." 42 U.S.C. § 2000e-2(a)(1). Race discrimination claims under Title VII simply require that race be "a motivating factor in the defendant's challenged employment decision." *Lewis v.*

15

*Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). McBeath contends that Indy Parks discriminated against her because of her race and white employees were treated more favorably.

McBeath can prove discrimination under Title VII by using either the direct method, by proffering direct or circumstantial evidence that racial discrimination motivated the employment decisions, or the indirect, burden-shifting method. *Winsley v. Cook Cnty.*, 563 F.3d 598, 604 (7th Cir. 2009). But regardless of whether she uses the direct method of proof, indirect method, or both methods to support her claim, the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id*

McBeath proceeds under the indirect, burden-shifting method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the indirect method, McBeath must establish a *prima facie* case of discrimination on the basis of race by presenting evidence that: (1) she is a member of a protected class; (2) her job performance was meeting her employer's legitimate expectations; (3) she was subject to a materially adverse employment action; and (4) the employer treated similarly situated employees outside the protected class more favorably. *Winsley*, 563 F.3d at 604. If McBeath can establish those four elements, the burden shifts to the City to provide a legitimate, non-discriminatory reason for McBeath's termination from Indy Parks. *Lewis*, 36 F.4th at 760. If the City provides a non-discriminatory reason, the burden shifts back to McBeath to show the City's excuse was pretextual. *Id*.

McBeath has established, and the City does not dispute, that she is African American and therefore a member of a protected class. It is also undisputed that McBeath suffered an adverse employment action –termination of her employment. However, the parties dispute whether McBeath was meeting Indy Parks' legitimate job expectations and the City argues that McBeath cannot show that any similarly situated individuals outside of her protected class were treated more favorably.

McBeath has not established that she was meeting Indy Parks' legitimate job expectations. Although in her response she states Campbell praised her for her hard work and she never received any discipline, that assertion is not supported by her own evidence.[2] The City argues McBeath was not meeting Indy Parks' legitimate expectations and was terminated for violating their policies. McBeath violated workplace policies when she took food pantry items from vendors directly to her home before taking them to the Windsor Village food pantry (*see* Filing No. 60-11). McBeath was seen violating the food pantry policy on multiple instances (Filing No. 60-9) (referencing videos and/or photographs dated 9/30/2021, 1/11/2022, and 1/24/2022 that show McBeath taking donations into her home). These violations were seen and reported by McBeath's neighbor—albeit a disgruntled neighbor. McBeath did not designate any evidence that raises a genuine dispute of material fact on this issue. In addition, there were multiple customer complaints alleging that McBeath was helping herself to pantry goods before they were served to the public. The allegations provided sufficient probable cause for an independent judicial officer to authorize a search warrant and tracking device on McBeath's work vehicle. These complaints, coupled with the photographic and video evidence, support an inference that McBeath participated in

---

[2] The Court acknowledges that McBeath was recognized by the State of Indiana for her dedication and service to senior citizens and for her help in feeding meals to Indianapolis residents (*see* Filing No. 68-3). However, Campbell's deposition, submitted by McBeath, describes several instances of discipline (*see* Filing No. 68-8 at 30:2-6; 30:7-14; 32:6-20; 39:14-23).

unbecoming conduct that would tend to discredit the City-County in violation of Indy Parks' policies.

McBeath has also failed to demonstrate that a similarly situated white employee was treated more favorably than her. McBeath must present an employee who is similarly situated with respect to performance, qualifications, and conduct. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.". *Id.* at 617-18. McBeath's argument that King was treated more favorably than her fails for multiple reasons.

First, King held a different position than McBeath. King was an Assistant Program Coordinator, (Filing No. 68-5 at 7), whereas McBeath was an Assistant Park Manager. Additionally, McBeath fails to present any evidence to show whether King had the same supervisor or performance standards as her. McBeath's argument rests on the contention that King's conduct was worse than hers yet "she never received written Notices of Unacceptable Performance or Conduct while working for [Indy Parks] and [Indy Parks] did not terminate her" (Filing No. 67 at 4). King's conduct was different than McBeath's. Although King violated Indy Parks' Principles of Employment and Standards of Conduct, her conduct did not result in an IMPD investigation (*see* Filing No. 60-3 at 78:14-25, 79:4-8). McBeath's alleged criminal acts were initially reported by a citizen but then investigated by HR and IMPD. IMPD's investigation was separate from Indy Parks and utilized a state court judge-issued search warrant (Filing No. 60-10). King was also disciplined by Indy Parks for her unacceptable conduct (Filing No. 68-7; Filing No. 68-9; Filing No. 68-10; Filing No. 68-11). Indy Parks intended to terminate King's employment, but King

18

resigned before they began the termination process (Filing No. 60-3 at 79:9-25, 80:1-2). McBeath has not presented a similarly situated white employee who was treated more favorably; thus, she has failed to establish a *prima facie* case of racial discrimination.

Even if she had established a *prima facie* case, McBeath failed to establish pretext for the reasons discussed in the FMLA retaliation claim section. McBeath has not demonstrated that her termination was more likely than not motivated by a discriminatory reason – her race, or that Indy Parks' stated reason was pretextual and not credible. No evidence presented by McBeath casts doubt on Indy Parks' stated reason for terminating her. Based on the designated evidence, the Court's finds nothing supports a claim of race discrimination, rather the evidence supports the termination decision was due to McBeath's violations of Indy Parks' outlined policies. Because no reasonable juror could reach a different conclusion, summary judgment is **granted** in favor of the City on McBeath's Title VII race discrimination claim.

## IV.   CONCLUSION

Considering the designated evidence as a whole, and for the reasons explained above, the City's Motion for Summary Judgment (Filing No. 58) is **GRANTED** as to all claims. Final judgment will issue under separate order.

**SO ORDERED.**

Date: 4/29/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Amber K. Boyd
AMBER K. BOYD LAW
amber@amberboydlaw.com

Brandon E. Beeler
City of Indianapolis, Office of Corporation Counsel
brandon.beeler@indy.gov

19